**JWP ZACK, INC., Appellant–Defendant,**

v.

**HOOSIER ENERGY RURAL ELECTRIC COOPERATIVE, INC., Appellee–Plaintiff.**

No. 42A01–9710–CV–339.

Court of Appeals of Indiana.

April 13, 1999.

John E. Sparling, London Fischer, New York, New York, Susan R. Brooke, Ice Miller Donadio & Ryan, Indianapolis, Indiana, Attorneys for Appellant.

Rabb Emison, Robert P. Doolittle, Jr., Emison Doolittle Kolb & Roellgen, Vincennes, Indiana, R. Dennis Withers, G. Terrell Davis, Robins Kaplan Miller & Ciresi, Atlanta, Georgia, Attorneys for Appellee.

## OPINION

SHARPNACK, Chief Judge

JWP Zack, Inc. ("Zack") appeals the trial court's denial of its motion for partial summary judgment and its motion to compel the production of certain evidence. Zack raises two issues which we restate as:

(1) is there a genuine issue of material fact as to whether the limitation of liability clause contained in a 1990 agreement ("Mother Agreement") limits any liability Zack might have to Hoosier Energy Rural Electric Cooperative, Inc. ("Hoosier") for the loss that is the basis of this lawsuit; and,

(2) did the inadvertent disclosure of documents privileged as attorney-client communications during discovery waive Hoosier's right to invoke thereafter the privilege as to those documents.

We affirm.

This case arises from a 1992 fire which occurred at Hoosier's Merom Generating Station ("Station"). At the time of the fire, Zack was performing work, pursuant to a contract, at the Station for Hoosier. Hoosier sued Zack claiming that Zack's negligence caused the fire and resultant damages to the Station. Zack denied liability and further

claimed that any liability it might have was limited by the Mother Agreement.[1]

## I.

The first issue is whether there is a genuine issue of material fact as to whether the limitation of liability clause contained in the Mother Agreement applies to Hoosier's loss. Zack claims that the Mother Agreement is the contract that establishes the basic relationship between the parties and that its limitation of liability clause limits any liability Zack may have to Hoosier. To the contrary, Hoosier contends that the Mother Agreement was not in effect at the time of the fire and that the relationship between the parties is governed by an agreement entered into in 1992 ("1992 Agreement") which contains no limitation of Zack's liability.

The trial court denied Zack's motion for partial summary judgment refusing to hold that Zack's liability was limited by the Mother Agreement. The trial court found that there was no dispute as to the material facts; however, it held:

"Both parties ... throughout their motions and briefs, ask the Court to draw inferences and subjective conclusions from these facts which the law of this State prohibits at this stage of the proceedings. Therefore, both Motions for Partial Summary Judgment are denied."

Record, pp. 1240. Hoosier does not appeal the denial of its motion for partial summary judgment.

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). The moving party has the initial burden to make a prima facie showing of these requirements. *Shumate v. Lycan*, 675 N.E.2d 749, 752 (Ind.Ct.App.1997), *trans. denied*, 683 N.E.2d 595. Once the movant has made such a showing, the opponent must respond by setting forth specific facts showing a genuine issue for trial; the opponent may not simply rest on the allegations of the

pleadings. *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1371 (Ind.1992). On appeal, we are bound by the same standard as the trial court and may consider only those matters which were designated at the summary judgment stage of the proceedings. *Shumate*, 675 N.E.2d at 752. We do not weigh evidence, but will consider the facts in the light most favorable to the nonmoving party. *Reed v. Luzny*, 627 N.E.2d 1362, 1363 (Ind. Ct.App.1994), *reh'g denied, trans. denied*. Although the facts may be undisputed, summary judgment is inappropriate where "there are conflicting inferences which may be drawn from undisputed facts." *National City Bank, Indiana v. Shortridge*, 689 N.E.2d 1248, 1251 (Ind.1997), *opinion supplemented by*, 691 N.E.2d 1210.

The record contains five agreements for the provision of maintenance and repair work at Hoosier's Station. Hoosier is designated as the "owner" in all five. In two of them, the "contractor" is designated as Westerfield Company, Inc. The first of these two agreements was executed as of February 1, 1988, and provided that the contractor would provide repair and maintenance at the Station as separately authorized by owner's purchase orders. It contained a clause that limited the contractor's liability to "in no case exceed the contract price." Record, pp. 591–592. The term of the agreement was from January 1, 1988 through December 31, 1988, unless either party terminated on thirty days notice. The second agreement, in which the contractor was designated as Westerfield Company, Inc., was executed as of March 1, 1990 ("Mother Agreement"). The Mother Agreement also provided that the contractor would perform maintenance and repairs as requested by the owner by the issuance of owner's purchase orders. It also contained a limitation of liability clause, which again provided that the contractor's liability should "in no case exceed the contract price." Record, p. 637. The parties dispute the meaning of this clause and differ as to whether the clause refers to the sum total of all work

---

1. When referring to this agreement, Zack and Hoosier employ the terms "Mother Agreement" and "1990 Agreement," respectively. Because this agreement is at the heart of the issue and

there are at least two agreements signed in 1990 (this agreement and a 1990 contractor agreement), we employ the term "Mother Agreement" for purposes of clarity.

orders issued under the agreement, or whether the contract price refers to the amount of a particular work order. The Mother Agreement also provided for the provision of maintenance and repair for the calendar years 1990 and 1991 with an owner's "option to renew for an additional two years." Record, p. 633.

In a Hoosier interoffice memo dated January 8, 1988, from D.D. Winter to V.E. Peterson, Winter reported that during the fall of 1987, Hoosier had solicited bids from a number of contractors regarding maintenance at Merom. He wrote, "Attached is our evaluation which has Westerfield Company, Inc., a subsidiary of Zack Company, as the lowest evaluated bidder." Record, p. 576. He concluded, "Thus, we are recommending that Zack Company be awarded this contract for 1988." Record, p. 576. On January 11, 1988, the Hoosier Board of Directors adopted a resolution that, "This corporation enter into an agreement with Westerfield Company, Inc., . . . to perform such maintenance and repair services at Merom Generating Station as this corporation shall from time to time designate during the calendar year of 1988." In a Hoosier purchase order dated March 15, 1988, addressed to Zack Company, reference was made, "As per Hoosier Energy contract number 1278 signed by the Zack Company, Feb. 1, 1988." Record, p. 615. The record indicates that contract number 1278 is a number by which Hoosier referred to the agreement with Westerfield dated as of the 1st day of February, 1988.

In a Hoosier interoffice memo dated February 27, 1990, from D.D. Winter to V.E. Peterson, Winter wrote, "The annual maintenance contract with Zack expired at the end of 1989 . . . . based on our evaluation, we are recommending that Zack be awarded a two year contract with a one year extension at [Hoosier's] sole discretion." Record, p. 627. On March 12, 1990, the Hoosier board of directors adopted a resolution that, "This corporation enter into an agreement with Westerfield, Inc., for the said Westerfield Company, Inc., to perform such maintenance

and repair services at Merom Generating Station as this corporation shall from time to time designate during the calendars years of 1990 and 1991." Record, p. 631. In a letter dated September 1, 1988, on a letterhead featuring prominently "The Zack Company" and in smaller print "The Westerfield Company, Inc.," William J. Harrington, designated as Executive Vice President "Westfield Division," wrote to Hoosier that, "The Zack Company proposes to continue to provide maintenance services to Hoosier Energy for the calendar year 1989." Record, p. 618.

Thus, it appears from the record that during the period from 1988 through to the execution of the Mother Agreement, that the designations "Zack Company," "Westerfield Company, Inc.," and their variations were used loosely by all concerned.

The three other agreements providing for maintenance and repair at the Merom station were executed as of the 10th day of February, 1990, the 11th day of January, 1991, and the 8th day of January, 1992. In each of these agreements Hoosier Energy was designated as the owner and in the agreements executed as of the 10th day of February, 1990, and the 11th day of January, 1991, the contractor was referred to as "Zack Company," and in the agreement entered into as of January 8, 1992, the contractor was designated as "Zack/JWP." Record, pp. 641, 645, 655. Each of these three agreements provided for the performance of maintenance, repair, or other services at the Station and that, "The contract shall consist of this agreement, the annexed general conditions, and the annexed specifications, which shall comprise the total contract (Purchase Order)." [2] Record, pp. 641, 645, 655. Each of these agreements, except the 1992 Agreement, provided that it would "continue to remain in force from the date first written above, but may be terminated for any reason by either party upon thirty (30) days written notice to the other." Record, pp. 643, 646. Each also contained a clause which read: "There are no understandings between the parties hereto other than as set forth herein,

---

2. While all substantially the same, the 1992 Agreement reads: ". . . the annexed general conditions, specifications and purchase order(s),

which shall comprise the total contract." Record, p. 655.

and this agreement constitutes the ·entire agreement between the parties."[3] Record, pp. 643, 647, 658.

On December 16, 1991, Harrington, using the letterhead "Zack/JWP," sent Stan Wallace, the plant manager at the Station, a letter which read in pertinent part:

"Upon your acceptance, we would be pleased to renew our contract for an additional two year period under the same terms as our current contract. All rates will remain fixed for the new period, except for those adjustments allowed under paragraph 2(b) on page 2 of our agreement.

Again let me thank you for the privilege of working in your facility and we look forward to continuing our business relationship."

Record, p. 651.

On January 3, 1992, in a Hoosier interoffice memo, Winter wrote to Peterson that "[i]n 1990, we awarded a two year contract to Zack/JWP, with a one year extension at Hoosier's request, for maintenance and repair services at Merom .... we are recommending that we exercise the one year extension option in the present contract. Your approval is requested (see note)." Record, p. 653. The note read, "The board approved this contract along with the one year extension option in 1990. The board policies do not address this situation, but I assume that board approval is required." Record, p. 653. In a handwritten note on the memo dated January 8, 1992, Peterson wrote, "Please exercise the option for the one year extension as board approved." Record, p. 653. This memo may well refer to the Mother Agreement. However, the Mother Agreement was, by its terms, made with Westerfield Company, Inc. and contained no one year extension at Hoosier's request, but rather an option to renew for an additional two years. In any event, the next agreement that appears in the record after the January 3, 1992, memo is the one executed as of January 8, 1992, between Hoosier and Zack/JWP. Hoosier purchase orders dated February 21, 1992; February 27, 1992; May 21, 1992; August 25, 1992; and September 1, 1992; are all addressed to Zack/JWP and contain no reference to any contract or agreement between ·Zack/JWP and Hoosier under which the purchase orders are made.

Wallace, in his affidavit, stated that the contractor agreement dated January 8, 1992, and the purchase order dated August 28, 1992, together with some attachments were the contract for the work being done at the time of the fire "and no other documents." Record, pp. 246–247. His deposition testimony was to the same effect.

■ Taken all in all, it appears that in this situation, as in many, when all is going well and work is performed as required, no one cares too much about the nomenclature of the parties. But, when disaster strikes, precision becomes paramount. We cannot say, as the trial court could not say, that the record presents no genuine issues of fact or inferences from the facts as to whether the defendant JWP Zack, Inc. succeeded to the interests of Westerfield Company, Inc. in the Mother Agreement or that the Mother Agreement was renewed and in effect on October 5, 1992, when the loss at issue occurred. In addition, we cannot say whether the contract price contained in the Mother Agreement's limitation of liability clause refers to the total sum of all work orders or that of an individual work order. Where the paper trail is not clear, we must look to other sources to determine the intent and understanding of the parties; and, where there remain conflicting inferences which may be drawn from the facts, it is for the trier of fact to resolve any doubts, even though they may be slight. *Mortgage Consultants, Inc. v. Mahaney,* 655 N.E.2d 493, 494 (Ind.1995) (holding that summary judgment is inappropriate where material facts conflict or undisputed facts lead to conflicting inferences even if the court believes the nonmoving party will not succeed at trial). Therefore, we affirm the trial court's denial of Zack's motion for partial summary judgment on this issue. *See*

---

**3.** While all substantially the same, the 1992 Agreement substituted "and the contract as defined herein" for "and this agreement."

*National City Bank, Indiana,* 689 N.E.2d at 1251.

## II. Waiver

■ The second issue is whether the inadvertent disclosure of documents privileged as attorney-client communications waived Hoosier's right to invoke the privilege when the documents were later requested to be produced. The facts relating to the issue are as follows. During discovery and pursuant to a request for documents by Zack, Hoosier produced for inspection and copying by Zack's counsel between two and two and one-half boxes of documents at Hoosier's headquarters in Bloomington, Indiana. After Mr. Fred Biesecker, counsel for Zack, had been examining the documents for some time, Mr. R. Dennis Withers, counsel for Hoosier, came to him and asked whether Biesecker had reviewed certain documents that Withers had come to realize were privileged. Biesecker responded that he had reviewed those documents and would mark them to be copied and produced. Withers informed him that the documents were privileged and he would file a motion for a protective order. Zack then filed a motion to compel production of the documents on the ground that the inadvertent production of the documents waived any attorney-client privilege. The trial court denied Zack's motion. Zack appeals this motion.

We note that no Indiana state court decisions were found by either of the parties, the trial court, or this court that fall squarely on this issue. Rather, the parties cite conflicting cases from the federal system that can be roughly divided into three approaches.[4] The objective approach concludes that inadvertent disclosure forfeits the protection of the privilege without regard to the circumstances. *See Underwater Storage v. United States Rubber Company,* 314 F.Supp. 546, 548–549 (D.D.C.1970). The subjective approach continues the protection of the privilege if the disclosure was not intentional. *See Mendenhall v. Barber–Greene Co.,* 531 F.Supp. 951, 955 (N.D.Ill.1982). Finally, the balancing approach examines several factors in determining whether to continue the pro-

tection of the privilege depending upon the circumstances of the case. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Company,* 104 F.R.D. 103, 105 (S.D.N.Y.1985). It is this approach which the trial court applied when it held:

"The Court has considered the pleadings of the parties with regard to defendant's motion and supplemental motion to compel production of documents and plaintiff's motion for protective order. The Court finds that the 'objective test' pursued by [Zack] is too strict and is not fair to the client of the attorney who erred. Further it is found that the 'subjective test' urged by [Hoosier] is not realistic. Therefore, the Court adopts the "balancing test", which should be no surprise to either party. In that regard it is found as follows:

1. In view of the extensive request for production of documents by the defendant, the precautions taken by plaintiff's counsel as stated in the affidavit of R. Dennis Withers were reasonable under the circumstances.

2. Mr. Withers, counsel for plaintiff, attempted to rectify the production error within two and three-quarters hours after the attorney for [Zack], Fred R. Biesecker, began his examination of the produced documents, according to the affidavits of both attorneys.

3. Approximately two and one-half banker's boxes full of documents were produced as a result of defendant's request for discovery of which plaintiff claims privilege to 69 pages. Defendant has requested that 3,424 be photocopied and presented. This seems to the Court to be a very small number of pages in comparison to the volume of documents produced. In addition 44 pages, sans notations, of the document referred to in paragraph 12(a) of Mr. Wither's affidavit appear to the Court not to be protected under either the attorney-client or the work product privileges which would reduce the

---

4. State court decisions may be divided similarly. *See* 51 A.L.R.5th 603, 634–635 (1997).

actual number of privileged documents to 25.

4. The disclosure was only to Mr. Biesecker who was not permitted to take the privileged documents from plaintiff's office.

5. The documents sought to be produced and, conversely to be protected, are documents created for the purpose of this lawsuit by plaintiff, many of which admonish the reader against disclosure to outsiders. It is unfair to the plaintiff to allow the use of those documents against it simply because of the inadvertent brief disclosure by plaintiff's attorney.

\* \* \* \* \*

It is, therefore, ordered that the documents specified in paragraph 12, of R. Dennis Withers' affidavit except those attachments to the document specified in paragraph 12(A) which may be subject to discovery, sans notations, are now protected from discovery and need not be produced."

Record, pp. 232–233.

Although we found no cases like this one in our state courts, we do note that Indiana Rule of Evidence 501 provides that voluntary disclosure waives privilege. The Rule reads in pertinent part:

"(b) **Waiver of Privilege by Voluntary Disclosure**

A person with a privilege against disclosure waives the privilege if the person or person's predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged."

Evid. R. 501. In dissimilar settings, our supreme court has held:

"The work product privilege is a qualified one and can be waived. What constitutes a waiver of the privilege depends upon the circumstances. We have held that even where documents, e.g., police reports, are produced in a criminal trial context, this does not render them admissible if there is not an explicit or implicit waiver of the privilege."

*Jenkins v. State*, 627 N.E.2d 789, 798 (Ind. 1993), *reh'g denied, cert. denied*, 513 U.S. 812, 115 S.Ct. 64, 130 L.Ed.2d 21 (1994).

The objective approach has the advantage of clarity and simplicity in that once disclosure has been made, privilege is lost. This approach places the onus on the holder to protect confidentiality. It has the disadvantage of precluding any consideration of the circumstances of disclosure (short of compelled disclosure) to determine the overall fairness of the situation and balance the interest of protecting the confidentiality of attorney-client communications and the interest in making relevant evidence available for use at trial.

Similarly, the subjective approach also has the advantage of clarity and simplicity in that if one did not intend disclosure, the privilege is preserved. This approach has less tendency to require vigilance of the holder to preserve confidentiality. It also does not allow for consideration of the overall circumstances to determine the ultimate fairness of the situation.

We believe the better approach is one that allows the trial court to consider all of the relevant circumstances in determining whether the protection of the privilege is to be forfeited because of an accidental disclosure. We do not believe there is any rigid set of criteria, but the factors considered in cases like *Lois Sportswear* are clearly important to review of a case like this. These factors include "the reasonableness of the precautions to prevent inadvertent disclosure, the time taken to rectify the error, the scope of discovery," the extent of disclosure, and "an overreaching issue of fairness and the protection of an appropriate privilege which, of course, must be judged against the care or negligence with which the privilege is guarded with care and diligence or negligence and indifference." *Lois Sportswear*, 104 F.R.D. at 105.

In a trial court's consideration of the issue, the trial court will make determinations of fact and will base its judgment thereon. We will not reverse the trial court

in the absence of a showing of abuse of discretion. Unless the trial court's conclusions and judgment are clearly against the logic and effect of the facts and circumstances before it, there is no abuse of discretion. *Barth v. Barth,* 693 N.E.2d 954, 957 (Ind.Ct.App.1998), *trans. denied,* 706 N.E.2d 169. Here, the trial court considered several factors and concluded that the privilege was not forfeited. We cannot say that the trial court abused its discretion.

However, the matter may not end so simply. The determination of what contractual obligations bound the parties will turn on determining the intent and understanding of the parties. The material to be protected by the privilege for Hoosier would appear to indicate certain understandings on the part of Hoosier employees as to the contractual arrangements between the parties to this action. The fact of these understandings may well be relevant evidence. Confidential communications are protected. Facts are not. *Owens v. Best Beers, Inc.,* 648 N.E.2d 699, 702–703 (Ind.Ct.App.1995).

Ethical considerations are also present. Counsel, aware of the facts, must avoid permitting testimony to the contrary by their witnesses. Rule 3.3 of the Rules of Professional Conduct reads in pertinent part:

"(a) A lawyer shall not knowingly:

(1) make a false statement of material fact or law to a tribunal;

(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act against a tribunal by the client;

* * * * *

(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

(b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by [the attorney-client privilege]."

We do not prejudge the issues discussed above, but we do note them for the benefit of counsel and the trial court.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

SULLIVAN, J. and HOFFMAN, Sr. J. concur